**FILED**

JUN 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.            )
501 School Street, S.W., Suite 500   )
Washington, DC  20024,          )
                                )
            Plaintiff,          )
                                )     CASE NUMBER   1:06CV01135
v.                              )
                                )     JUDGE: Paul L. Friedman
FEDERAL BUREAU OF               )
INVESTIGATION                   )     DECK TYPE: TRO/Preliminary Injunction
935 Pennsylvania Avenue, NW     )
Washington, DC 20535            )     DATE STAMP: 06/22/2006
                                )
            Defendant.          )
_____ )

### PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel, and pursuant to Fed.R.Civ.P.

65(a) and LCvR 65.1(c), respectfully requests that the Court preliminarily enjoin Defendant Federal

Bureau of Investigation ("FBI"), and the FBI's agents, attorneys, employees, representatives, and all

other persons acting in concert with or providing assistance to the FBI, from withholding records

requested by Judicial Watch under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*

As grounds therefor, Judicial Watch states as follows:

### MEMORANDUM OF LAW

I.    **Factual Background.**

On December 15, 2004, Judicial Watch, a not-for-profit, educational organization that

obtains and disseminates information about public issues and the operations of government, sent

a FOIA request to the FBI and several other federal agencies, by facsimile and certified mail,

seeking access to any and all records concerning or relating to the following subjects:

(1)    Video camera recording(s) obtained by federal official(s) and/or law enforcement from the Sheraton National Hotel in Arlington, Virginia, on or about September 11, 2001.

(2)    Video camera recording(s) obtained by any federal official(s) and/or law enforcement from a Nexcomm/Citgo gas station in the vicinity of the Pentagon on or about September 11, 2001.

(3)    Pentagon security video camera recording(s) showing Flight 77 strike and/or hit and/or crash into the Pentagon on September 11, 2001.

(4)    Closed Circuit Television (CCTV) video camera recording(s) obtained by any federal official(s) and/or law enforcement from the Virginia Department of Transportation ("VDOT") and/or the VDOT "Smart Traffic Center" on or about September 11, 2001.

*See* Affidavit of Christopher J. Farrell at ¶ 2 ("Farrell Affidavit"), attached hereto as Exhibit 1.

Judicial Watch's December 15, 2004 request also sought a waiver of both search and duplication

fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii). *Id.*

On or about December 29, 2004, Judicial Watch received a letter from David M. Hardy

of the FBI's Records Management Division acknowledging receipt of Judicial Watch's

December 15, 2004 request. Farrell Affidavit at ¶ 3. On or about March 22, 2005, Judicial

Watch received a second letter from Mr. Hardy. *Id.* at ¶ 4. This letter stated that no documents

responsive to part one of the request had been found. *Id.* Mr. Hardy's letter further stated that

documents responsive to parts 2-4 had been found, but were exempt from production pursuant to

5 U.S.C. § 552(b)(7)(A). *Id.*

On or about April 4, 2005, Judicial Watch submitted an appeal of the FBI's March 22,

2005 denial letter. Farrell Affidavit at ¶ 5. On or about April 8, 2005, Judicial Watch received a

letter from Priscilla Jones, Chief, Administrative Staff of the U.S. Department of Justice's Office

of Information and Privacy, acknowledging receipt of Judicial Watch's April 4, 2005 FOIA appeal. *Id.* at ¶ 6.

More than one year later, on May 22, 2006, Judicial Watch sent the FBI a letter requesting an update as to when it could expect a decision regarding its April 4, 2005 appeal. Farrell Affidavit at ¶ 7. Judicial Watch's May 22, 2006 letter noted that in a similar case, *Judicial Watch, Inc., v. Department of Defense*, C.A. No. 06-0309 (RBW), the U.S. Department of Defense ("DOD") had invoked 5 U.S.C. § 552(b)(7)(A) to withhold another videotape depicting Flight 77 striking the Pentagon, but released the videotape to Judicial Watch on May 16, 2006, after the trial of Zacarias Moussaoui had ended. *Id.*

Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), the FBI was required to make a determination regarding Judicial Watch's April 4, 2005 FOIA appeal by May 3, 2005. As of June 21, 2006, however, the FBI has failed to issue a decision on Judicial Watch's April 4, 2005 FOIA appeal, nor has it released any videotapes responsive to Judicial Watch's December 15, 2004 request. Farrell Affidavit at ¶ 8.

## II.    **Discussion.**

### A.    **Standard for a Preliminary Injunction.**

Several, well-established factors are to be considered in determining whether to grant a preliminary injunction. Those factors are: (1) whether the moving party is substantially likely to succeed on the merits; (2) whether the moving party will suffer irreparable harm for which there is no adequate legal remedy in the absence of the injunction; (3) whether the harm to the movant if relief is denied outweighs the harm to the nonmovant if relief is granted; and (4) whether the preliminary injunction is in the public interest. *See Cityfed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). No single factor is dispositive. Rather, a court "must balance the strengths of the requesting party's arguments in each of the four required areas." *Id.* at 747. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* Because any analysis of these factors weighs heavily in favor of granting a preliminary injunction in this case, such relief must be afforded Judicial Watch.

### B.    There Is a Substantial Likelihood That Judicial Watch Will Succeed on the Merits of this Case.

Although Judicial Watch need not demonstrate an absolute certainty of success on the merits, it is very likely that it will succeed on the merits in this matter.[1] The U.S. Supreme Court has plainly stated that underlying FOIA is "a general philosophy of *full* agency disclosure." *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 754 (1989) (quotation marks and citations omitted) (emphasis added). The FOIA "provides that all documents are available to the public unless specifically exempted by the Act itself." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.D.C. 1973). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter *de novo.*'" *Id.* at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).

---

[1]    *See Udall v. D.C. Transit System, Inc.*, 404 F.2d 1358, 1359 n.3 (D.C. Cir. 1968) ("[O]n a motion for a preliminary injunction it is not necessary and it is not appropriate to make a definitive decision on such a question [*i.e.*, the merits of the claim], but merely to reach the conclusion that there is a strong likelihood that at trial the plaintiff will prevail.") (quotation marks and citation omitted).

In this case, the FBI admitted that documents responsive to parts 2-4 of Judicial Watch's FOIA request had been found, but claimed they were exempt from production pursuant to 5 U.S.C. § 552(b)(7)(A). "Exemption 7 applies generally to 'records or information compiled for law enforcement purposes. . . .' 5 U.S.C. § 552(b)(7) (1982), *as amended by* Pub. L. No. 99-570, § 1802(a) (Oct. 27, 1986). But it exempts such documents from disclosure only to the extent that production of the information might be expected to produce one of six specified harms, *see id.* § 552(b)(7) (A) -- (F). Thus, in order to prevail on an Exemption 7 claim, the government must bear its burden of demonstrating both the threshold law enforcement purpose and the danger that at least one of the specified harms would flow from disclosure." *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987) (citing *FBI v. Abramson*, 456 U.S. 615 (1982)).

"Exemption 7(A) of the FOIA protects from mandatory disclosure records compiled for law enforcement purposes whose production could 'reasonably be expected to interfere with enforcement proceedings.'" *Putnam v. U.S. Dep't of Justice*, 873 F. Supp. 705, 713 (D.D.C. 1995) (citing 5 U.S.C. § 552(b)(7)(A)). "The government has the burden of demonstrating the ways in which disclosure of the information would interfere with prospective law enforcement proceedings." *Id.* (citing *Campbell v. U.S. Dep't of Health and Human Services*, 682 F.2d 256 (D.C. Cir. 1982)).

In this case, the FBI cannot meet its burden. In a related FOIA lawsuit seeking access to Flight 77 videotapes in the possession of the FBI, *Bingham v. U.S. Dep't of Justice, et al.*, C.A. No. 1:05-00475 (PLF), the FBI has also asserted Exemption 7(A) to justify withholding the requested tapes. *See* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 11-18 (Docket No. 13). The FBI's only stated reason for invoking

Exemption 7(A) in that case was the pending law enforcement proceeding against Zacarias

Moussaoui. *Id.* The Moussaoui proceeding has concluded, however. Thus, the FBI has no

further justification for withholding the videotapes at issue.[2] Because the FBI cannot meet its

burden of showing that the production of the videotapes at issue here could reasonably be

expected to interfere with an enforcement proceeding, Judicial Watch will likely succeed on the

merits of its claim.

    C.    **Judicial Watch Is Suffering Irreparable Harm as a Result of the FBI's
          Willful Failure to Comply with the FOIA.**

    Irreparable harm is an injury for which the court can not compensate should the movant

prevail. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers*

*Assoc. v. Federal Power Comm.*, 259 F.2d 921, 925 (D.C. Cir. 1958)). "[I]t is well-established

that acts by Government agencies in derogation of statutory rights of the public or certain

individual members of the public can constitute irreparable injury." *Gates v. Schlesinger*, 366

F.Supp. 797, 800 (D.D.C. 1973) (plaintiffs were entitled to a preliminary injunction because

plaintiffs demonstrated irreparable injury by being shut out of a public meeting, as was their right

to attend under Federal Advisory Committee Act); *see also Public Citizen v. Nat'l Economic*

*Comm.*, 703 F.Supp. 113 (D.D.C. 1989) (plaintiffs were entitled to a temporary restraining order

---

[2]    In fact, in *Bingham v. U.S. Dep't of Justice, et al.*, C.A. No. 1:05-00475 (PLF),
U.S. District Judge Paul L. Friedman recently ordered the FBI to show cause why its Motion for
Summary Judgment should not be denied as moot because the criminal proceeding against
Moussaoui had concluded. *See* May 5, 2006 Order (Docket No. 17). In addition, in a similar
lawsuit seeking to compel production of another videotape of Flight 77 striking the Pentagon,
*Judicial Watch, Inc. v. U.S. Dep't of Defense*, C.A. No. 06-0309 (RBW), the U.S. Department of
Defense ("DOD") initially withheld the tape at issue, citing 5 U.S.C. § 552(b)(7)(A) and the
ongoing Moussaoui prosecution. After the conclusion of the Moussaoui trial, DOD released the
tape to Judicial Watch. *See* Farrell Affidavit at ¶ 7.

and eventually granted a permanent injunction because plaintiffs demonstrated irreparable injury by being shut out of a public meeting, as was their right to attend under Federal Advisory Committee Act.). As noted, the FOIA "provides that all documents are available to the public unless specifically exempted by the Act itself." *Vaughn*, 484 F.2d at 823.

In this case, as demonstrated in Section B, *supra*, the FBI cannot meet its burden of showing that the records at issue are exempted under Exemption 7(A). Thus, Judicial Watch has a statutory right to receive the records requested. As a result of the denial of their statutory right, Judicial Watch is being irreparably harmed. *See also* Farrell Affidavit at ¶ 9.

### D.    Entry of a Preliminary Injunction Will Not Cause Harm to Other Parties.

Any harm to the FBI by granting the injunctive relief would be slight, if not non-existent. Indeed, the FBI will not be harmed by being obliged to conform to the principle of full agency disclosure imposed by statute, considering it has no legal basis for withholding the requested records. "Rather than harm, this will highlight vividly the essence of our democratic society, providing the public its right to know its government is conducting the public's business." *Public Citizen*, 703 F.Supp. at 129.

### E.    Entry of a Preliminary Injunction Is in the Public's Interest.

Dissemination of the videotapes at issue is clearly in the public interest. When Judicial Watch secured the release of a DOD videotape of Flight 77 striking the Pentagon and made the tape available on its website, the number of people attempting to view the tape overwhelmed Judicial Watch's site. *See* Farrell Affidavit at ¶ 9. Judicial Watch subsequently arranged for the DOD videotape to be viewed on "YouTube," an internet-based media company with greater

hosting capacity, and, according to "YouTube," the tape has been viewed more than 1.5 million times. *Id.* An additional 750,000 viewers have seen the DOD videotape on Judicial Watch's website since May 16, 2006. *Id.* Clearly, there is great public interest in viewing the videotapes at issue, and entry of a preliminary injunction is most certainly in the public interest now that the Moussaoui trial has ended.

## III.    Conclusion.

For the foregoing reasons, Judicial Watch respectfully requests that the Court grant its motion for a preliminary injunction and preliminarily enjoin the FBI from withholding the records requested by Judicial Watch under FOIA.

Respectfully submitted,

JUDICIAL WATCH, INC.

Paul J. Orfanedes
D.C. Bar No. 429716
Suite 500
501 School Street, S.W.
Washington, DC 20024
(202) 646-5172

Attorneys for Plaintiff

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.                    )
501 School Street, S.W., Suite 500      )
Washington, DC 20024,                   )
                                        )
                    Plaintiff,          )     Civil Action No.
                                        )
v.                                      )
                                        )
FEDERAL BUREAU OF                       )
INVESTIGATION                           )
935 Pennsylvania Avenue, NW             )
Washington, DC 20535                    )
                                        )
                    Defendant.          )
_____)

## AFFIDAVIT OF CHRISTOPHER J. FARRELL

I, Christopher J. Farrell, being duly sworn, hereby depose and say:

1.      I am the Director of Investigations and Research for Judicial Watch, Inc.

("Judicial Watch"), which is located at 501 School Street, SW, Suite 500, Washington, DC

20024. I make this declaration based upon my personal knowledge of the contents herein.

2.      On December 15, 2004, Judicial Watch, a not-for-profit, educational organization

that obtains and disseminates information about public issues and the operations of government,

sent a Freedom of Information Act ("FOIA") request to the Federal Bureau of Investigation

("FBI") and several other federal agencies, by facsimile and certified mail, seeking access to any

and all records concerning or relating to the following subjects:

 (1) Video camera recording(s) obtained by federal official(s) and/or law
   enforcement from the Sheraton National Hotel in Arlington, Virginia, on
   or about September 11, 2001.

Page 1 of 4

**06 1135**

**FILED**

JUN 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(2)   Video camera recording(s) obtained by any federal official(s) and/or law enforcement from a Nexcomm/Citgo gas station in the vicinity of the Pentagon on or about September 11, 2001.

(3)   Pentagon security video camera recording(s) showing Flight 77 strike and/or hit and/or crash into the Pentagon on September 11, 2001.

(4)   Closed Circuit Television (CCTV) video camera recording(s) obtained by any federal official(s) and/or law enforcement from the Virginia Department of Transportation ("VDOT") and/or the VDOT "Smart Traffic Center" on or about September 11, 2001.

Judicial Watch's December 15, 2004 FOIA request also sought a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii). A true and correct copy of Judicial Watch's FOIA request is attached hereto as Exhibit A.

3.   On or about December 29, 2004, Judicial Watch received a letter from David M. Hardy of the FBI's Records Management Division acknowledging receipt of Judicial Watch's December 15, 2004 request.

4.   On or about March 22, 2005, Judicial Watch received a second letter from Mr. Hardy. This letter stated that no documents responsive to part one of the request had been found. Mr. Hardy's letter further stated that documents responsive to parts 2-4 had been found, but were exempt from production pursuant to 5 U.S.C. § 552(b)(7)(A).

5.   On or about April 4, 2005, Judicial Watch submitted an appeal of the FBI's March 22, 2005 denial letter.

6.   On or about April 8, 2005, Judicial Watch received a letter from Priscilla Jones, Chief, Administrative Staff of the U.S. Department of Justice's Office of Information and Privacy, acknowledging receipt of Judicial Watch's April 4, 2005 FOIA appeal.

7.      More than one year later, on May 22, 2006, Judicial Watch sent the FBI a letter

requesting an update as to when it could expect a decision regarding its April 4, 2005 FOIA

appeal. Judicial Watch's letter noted that in a similar case, *Judicial Watch, Inc. v. U.S. Dep't of*

*Defense*, C.A. No. 06-0309 (RBW), the U.S. Department of Defense ("DOD") had invoked 5

U.S.C. § 552(b)(7)(A) to withhold another videotape depicting Flight 77 striking the Pentagon,

but released the videotape to Judicial Watch on May 16, 2006, after the trial of Zacarias

Moussaoui had ended.

8.      As of June 21, 2006, the FBI has failed to issue a decision on Judicial Watch's

April 4, 2005 FOIA appeal, nor has it released any videotapes responsive to Judicial Watch's

December 15, 2004 request.

9.      Judicial Watch is being injured as a result of the FBI's failure to release the

videotapes at issue.  A vital part of Judicial Watch's mission is providing information to the

public about current issues and events.  Judicial Watch has been attempting to obtain the

videotapes at issue from the FBI since December 2004, and the FBI's failure to produce the

requested videotapes, without legal justification or excuse, is harming Judicial Watch's ability to

provide information to the public about the September 11, 2001 terrorist attacks.  That the attacks

remain an important public issue is demonstrated by the fact that, when Judicial Watch secured

release of the DOD videotape and posted the tape on its website on May 16, 2006, the number of

viewers attempting to view the tape overwhelmed Judicial Watch's website.  Judicial Watch

subsequently arrange for the DOD videotape to be hosted on "YouTube," an internet-based

media company with  greater capacity, and, according to "YouTube," the tape has been viewed

more than 1.5 million times.  An additional 750,000 viewers have seen the DOD videotape on

Judicial Watch's website since May 16, 2006.

I declare under penalty of law that the foregoing is true and correct.  Executed on June 22,

2006 in the District of Columbia.

Christopher J. Farrell

EXHIBIT A

**Judicial Watch** ™

*Because no one*
*is above the law!*

December 15, 2004

James Hogan
Office of Freedom of Information/
   Security Review
DEPARTMENT OF DEFENSE
Room 2C757
1155 Defense Pentagon
Washington, DC 20301-1155
(Fax: 703-693-7341)
(Art. No.: 7002 0860 0004 9551 3604)

Tony Kendrick
Director
Departmental Disclosure
DEPARTMENT OF HOMELAND
   SECURITY
Room 3310-15
Washington, DC 20528
(Fax: 202-772-5036)
(Art. No.: 7002 0860 0004 9551 3611)

David M. Hardy, Chief
Records/Information Dissemination Section
Records Management Division
FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue, N. W.
Washington, DC 20535-0001
(Fax: 202-324-3367)
(Art. No. 7002 0860 0004 9551 3598)

Thomas J. McIntyre, Chief
FOIA/PA Unit
Criminal Division
DEPARTMENT OF JUSTICE
Suite 1127, Keeney Building
Washington, DC 20530-0001
(Fax: 202-514-6117)
(Art. No.: 7002 0860 0004 9551 3628)

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U.S. Department of Homeland Security ("DHS"), Department of Defense ("DOD"), and Federal Bureau of Investigation ("FBI") produce any and all agency records concerning, relating to, or reflecting the following subjects:

> (1)    Video camera recording(s) obtained by federal official(s) and/or law enforcement from the Sheraton National Hotel in Arlington Virginia, on or about September 11, 2001.

06 1135

**FILED**

JUN 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Judicial Watch, Inc. FOIA Request
December 15, 2004
Page 2

     (2)    Video camera recording(s) obtained by any federal official(s) and/or law enforcement from a Nexcomm/Citgo gas station in the vicinity of the Pentagon on or about September 11, 2001.[1]

     (3)    Pentagon security video camera recording(s) showing Flight 77 strike and/or hit and/or crash into the Pentagon on September 11, 2001.

     (4)    Closed Circuit Television (CCTV) video camera recording(s) obtained by any federal official(s) and/or law enforcement from the Virginia Department of Transportation ("VDOT") and/or the VDOT "Smart Traffic Center" on or about September 11, 2001.[2]

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, printed matter, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, statements, checks, statistics, surveys, affidavits, minutes, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

---

[1]    Bill McKelway. "Scars are Still Visible in Northern Virginia," *Richmond Times-Dispatch.* December 9, 2001. Pp. A-1

[2]    Virginia Department of Transportation (VDOT) Internet website.
[ http://www.virginiadot.org/comtravel/smart-traffic-center-nova-security.asp ]

Judicial Watch, Inc. FOIA Request
December 15, 2004
Page 3

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)      Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

(2)      Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)      Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example, in September 1998 Judicial Watch published the *Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office.* This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among other regular means. In August 1999, Judicial Watch published *Filegate Status Report*, which is 136 pages long and is supported by nearly 1000 pages of documentation. In March 2001, Judicial Watch published *The Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon an sampling of ballots reviewed by Judicial Watch pursuant

Judicial Watch, Inc. FOIA Request
December 15, 2004
Page 4

> to Florida's version of FOIA. In February 2002, Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002, Judicial Watch published *Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists.* Most recently on November 21, 2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility.* (GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony*, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C."

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch is a member of the National Religious Broadcast Association and has been granted press credentials at a number of national conventions and other events.

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch, Inc. has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts to monitor the operations and activities of the federal government and to educate the public about these operations and activities, and, in particular, as part of an investigation into the facts and circumstances surrounding the crash of Flight 77 into the Pentagon on September the 11th 2001.

Judicial Watch, Inc. FOIA Request
December 15, 2004
Page 5

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, as the request specifically seeks information about the crash of Flight 77 into the Pentagon on September 11, 2001.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience because the records relate directly to the facts and circumstances surrounding the crash of Flight 77, which has come under scrutiny from European authors and Internet sources who question the facts and evidence that the commercial passenger jet did indeed crash into the Pentagon.

French journalist Thierry Meyssan has authored a controversial book entitled *L'Effroyable Imposture* (*The Frightening Fraud*), which as been translated into English and published in America as *9/11: The Big Lie*.[3] In the book the author makes allegations that the object that struck the Pentagon on 9/11 was not a airplane (Flight 77), but a missile.

According to the allegations published by Meyssan and circulating on the Internet, based on eye-witness descriptions, the characteristics of the object in the moments before the impact more resemble a missile than an airplane. Meyssan claims the lack of debris on the ground and inside the Pentagon, as well as lack of more significant damage to the Pentagon rings indicate that a missile, not an airplane, struck the Pentagon that day. Release of the video recordings that were reportedly obtained that day will put an end to these allegations and questions, and fully inform the American public of the details of the crash into the Pentagon. The crash has already been widely covered by the press and investigated by private groups and the government with findings published, including those done by the American Society of Civil Engineers (ASCE).

The taxpaying American public deserves full disclosure of any direct recording of the most deadly terrorist attack on America in history.

---

[3]    Thierry Meyssan. *9/11: The Big Lie*. (Continental Sales: August 1, 2002)

Judicial Watch, Inc. FOIA Request
December 15, 2004
Page 6

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, to the public via its radio programs, website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch, Inc. has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including its radio programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding of the crash because relatively little is known about it from recorded sources. Furthermore, very little is known about the recordings requested in this letter. Gas station attendant Jose Velasquez stated that "the gas station's security cameras are close enough to the Pentagon to have recorded the moment of impact." He further stated "I've never seen what the pictures looked like. . . The FBI was here within minutes and took the film."[4]   The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch. requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

---

[4]      Bill McKelway. "Scars are Still Visible in Northern Virginia," *Richmond Times-Dispatch.* December 9, 2001. Pp. A-1

*Richmond Times Dispatch (Virginia) December 9, 2001 Sunday City Edition*

Copyright 2001 Richmond Newspapers, Inc.
Richmond Times Dispatch (Virginia)

December 9, 2001 Sunday City Edition

**SECTION:** AREA/STATE; Pg. A-1

**LENGTH:** 1984 words

**HEADLINE: SCARS ARE STILL VISIBLE IN NORTHERN VIRGINIA;**
A SENSE OF CAMARADERIE HELPS TO SOFTEN THE TENSION AND PAIN

**BYLINE:** Bill McKelway, Times-Dispatch Staff Writer, Contact Bill McKelway at (804) 649-6601 or bmckelway@timesdispatch.com,

**DATELINE:** ARLINGTON

**BODY:**
The Pentagon, the other ground zero, looks deceptively unblemished. Construction workers have cauterized and sealed its gaping, wedge-shaped wound.

On a hillside a half-mile away, saddened mourners and stunned citizens have gathered daily for three months. They leave tokens of remembrance.

Thousands upon thousands of the patriotic mementos have been cleared away and stored inside the Pentagon itself - as if the five-sided building of concentric rings is strong enough to absorb not only the pain of the 190 people who died there but also the grief of survivors.

"Thank you for the tremendous response!!" a printed sign reads at the site. It says that "all historical artifacts" have been collected "for their preservation and safekeeping."

Three months ago, on Sept. 11 at 9:38 a.m., a Tuesday, Jose Velasquez heard the rumble of imminent death overhead.

"I knew something was wrong. The planes come more from the north and west [to land at Reagan National Airport] not from the south. And not so low."

He was talking on the telephone that morning to a friend who was feeding him gauzy reports about airplane crashes at the World Trade Center in New York. But Velasquez slammed down the receiver and raced outside when he felt the gas station he supervises suddenly begin to tremble from a too-close airplane.

"It was like an earthquake," the Costa Rican native said last week.

What Velasquez felt above him almost within touching distance was American Airlines Flight 77 just seconds before impact.

His gas station, opened only to Department of Defense personnel, is the last structure between the Pentagon and the hillside that hours later would become a

[Attached as exhibit to Judicial
Watch FOIA request, dated
DEC. 1 5 2004]

wailing knoll.

"By the time I got outside all I could see was a giant cloud of smoke, first white then black, coming from the Pentagon.

"It was just a terrible, terrible thing to be so close to."

Today, almost three months after the devastating attack, Velasquez still trembles when he talks about the incident that has forever changed the military, government, and technology polyglot that is Northern Virginia.

"Even today," said Velasquez, "people who come here tell me they are frightened to come to work. You can see it in their eyes."

Velasquez says the gas station's security cameras are close enough to the Pentagon to have recorded the moment of impact.

"I've never seen what the pictures looked like," he said. "The FBI was here within minutes and took the film."


* * *

Indelibly etched in the memories of millions of Northern Virginia residents, though, are the events of Sept. 11 and the sense of transformation they have wrought.

The change goes far deeper than the red, white and blue paraphernalia that adorns so many automobiles. The region's notorious traffic jams resemble waylaid Independence Day parades frozen in time.

The tenor of life has taken on a tuning-fork vibrancy, a tension that begs the question of what will befall us next but softened by a sense of necessary, resolute camaraderie.

At local courthouses, criminal charges linked to Virginia's unwitting role in aiding the terrorist attack through the Department of Motor Vehicles identification process are straining due process rights.

At a mailing center near Sterling, fears of anthrax contamination are subsiding. But a postal worker from the Fredericksburg area has died from anthrax he contracted at a facility in Maryland and a Winchester man's fight for life after inhaling spores was the topic of news reports.

At a convenience store, a reporter asked a Pakistani clerk how he has been treated of late. His store is off Columbia Pike, a road bisecting densely packed, multicultural Arlington County neighborhoods where Christmas decorations seem to go wanting.

"Oh, fine, fine," says the man, who wears an American flag pin where a name tag should be. "I have been here 17 years, you know."

But as he talks, he is edging away from customers toward the refrigerated burritos and his eyes look as if they are searching for a hiding place from overt attention.

Part of Jw FOIA,     DEC. 1 5 2004

\* \* \*

At a parking payment booth at Reagan National Airport, attendant Sibghat Khan, a native of Pakistan, attributed his seniority and Northern Virginia's melting pot society for keeping his job alive during lean times.

But he's been laid off from a second airport job shuttling airplanes on the tarmac. Reduced flights have taken a toll at the sparkling, refurbished facility.

Are things back to normal? he was asked.

"I wish," he said worriedly.

The official mourning process is still an almost daily ritual.

From his gas station, Velasquez can watch funeral processions enter Arlington National Cemetery. Four missing Pentagon personnel, two of them Northern Virginians, still have not been positively identified and accounted for.

Monday, retired Army Lt. Col. Gary F. Smith, 55, will finally be laid to rest at Arlington. He will be deservingly remembered as a dedicated hero, his family and friends say.

Thirty years ago, in April 1971, he charged back into a burning chopper downed near Ky Tra in Vietnam to rescue fellow soldiers.

On Sept. 11, Smith, head of the Army's retirement program, was called to a meeting at the Pentagon. He never had a chance to duplicate the act of courage that won him the Soldier's Medal for heroism in Vietnam.

"He was at the point of impact," explained Smith's widow, Ann, with a tragic economy of words.

He leaves four daughters and scores more adopted loved ones whom he coached in a Mount Vernon area recreational soccer league.

"This is a man who was totally dedicated to the military, to its retirees and widows, and to his community," said James Harrison, a casualty assistance officer who was Smith's longtime friend.

Ann Smith said she has been stunned by the Mount Vernon community's support and by the care shown by the Army, a care that her own husband helped nurture.

Local Boy Scouts have even raked leaves from the Smith family's lawn.

Letters of condolence have arrived from Gov. Jim Gilmore and his wife, Roxane, and from President Bush and his wife, Laura.

Part of Jew FOIA DEC. 1 5 2004

* * *

Almost 30 miles from the Pentagon, at Rockledge Elementary School in Prince William County, the shock of Sept. 11 has "pretty much worn off," principal Sandra Carter said.

It has been a difficult process for some families.

"We had one family from the midwest who had just moved here and they said they weren't going to put up with it all. They left to go back home," she said.

There was a tussle one day between a Pakistani child and an Afghan child, but it formed and dissipated as quickly as a ballfield dust devil.

"We got our teachers together and made sure we were putting out the same message; to make sure the kids knew they could talk to us about it."

Some children thought there were hundreds of planes and hundreds of attacks: each television replay registered as a new event.

And there was this: "One father came to the school office that morning who worked at the Pentagon. He was so worried for his child," Carter said.

Struggling to keep his composure, the dad dropped his gaze toward the floor.

"My goodness. I've forgotten to wear my shoes," he blurted.


* * *

In nearby Woodbridge, Gloria Hicks speaks about the importance of love and care. She's director of a child-care center that is part of Minnieland Private Day School Inc.

Hicks' husband is a part-time worker at the Pentagon, a classified document shredder. "He wasn't there that day," said Hicks.

But in a matter of minutes after the attack, Minnieland teetered on the brink of pandemoniumland.

"The phone was ringing off the hook," Hicks said. "But right from the start, we knew our mission was to let parents know that this was a safe, loving place for the children.

"You give them that confidence that this is a place they don't have to worry about and that makes things easier to get through the other things."

Hicks and other Minnieland workers received a plaque from company headquarters thanking each worker for the care they showed the kids.


* * *

Part of Jw FOIA
DEC. 1 5 2004



John Doyle works a block from the White House. "We heard the impact of the plane hitting the Pentagon," he said. "It was that loud."

He scrambled back to his Arlington home, a place now that has become an odd refuge of sorts for thousands of people.

They drive and stroll by at night, stunned by Doyle's Christmas light tableau, an outline of the World Trade Center and the New York skyline beside an outline of Washington, including the Pentagon.

"There's a hole in the Pentagon and it has red, white and blue lights streaming from it," Doyle said.

A neighbor of Arabian descent helped erect a dove of peace that oversees the display. "He joked with me about the crescent moon I put up being in his honor," said Doyle.

The idea for the cityscape came to Doyle in the days after the attack when neighbors wondered how his ingenuity for lighting design would address the uncertainty of the times. He'd erected a champagne flute for the millennium; for 2001 he created a space odyssey.

"What we've done seems to touch something in people. They leave cookies and letters. One lady from New York broke into tears. It's hard to explain."

In the past months, Doyle said he senses that people have become much more aware of one another.

"You see people talking a lot more to each other - in stores, on the streets. There's a kindness that you didn't see so much of before. There's a huge population of people and a lot of them aren't from this area. They think of home as somewhere else.

"Now there's more of a feeling that we're all in this together and it's important to make the best of what we have here."


* * *

Jabbing through his answering machine messages the morning of Sept. 11, The Rev. John D. Hortum could feel the anxiety building among his communicants. The World Trade Center disaster was underway.

One message, from a woman clearly in distress and terribly frightened, stuck out.

"It took me a few seconds before I realized it was from my wife," he said.

Leslie Hortum was trapped in her car beside the Pentagon. Flight 77 had just flown directly overhead, clipping light poles as it went. A piece of wreckage was lodged against the car.

"It was just a terrible feeling," said Hortum, rector at the Church of Saint Clement,

[ Part of JW FOIA DEC. 1 5 2004 ]



an Episcopalian church on the southern edge of Arlington County.

"It was another 20 or 30 minutes before there was anything on the television that anything had even happened in Washington. This was the first word I got."

Hortum rushed to the church school, filled with kids.

"We're under attack, under attack," he whispered to Christine Yeannakis, the school director.

"I figured he was telling me the vestry was upset about something. We had no idea," Yeannakis recalled.

Then a supersonic boom from somewhere in the sky hushed the playground and Yeannakis hauled the kids into the basement.

Over the next few hours, parents straggled in to retrieve their kids. "One lady walked all the way from the Pentagon in her high heels," Yeannakis said.

A low-flying plane or helicopter still sets nerves on edge, Hortum said.

But the congregation seems to be settling in and many people have volunteered with the Red Cross.

"I think everybody is still sort of feeling that they don't really know how they're feeling," said Hortum.

"Things have changed so much. There's an anger that people feel for having all this beset them, for having to feel this anxiety. But there's a very real sense that we need to be aware of people beyond ourselves."

Hortum said he and his wife have always been cognizant of the important moments they've shared over the years.

"We've never been the type of people to not be aware of special times between us," he said. "But since September 11, I think we've made it a point to express those moments in words, to not just assume we are sharing something important."

**GRAPHIC:** PHOTO

**LOAD-DATE:** December 11, 2001

*Part of JW*
*FOIA Request* DEC. 1 5 2004

 **VDOT** Virginia Department of Transportation

About VDOT     Maps     Careers     News

Road Conditions | Travel Center | Business Center | Programs | Projects & Studies | Search


Click for info near you

**Travel Center**

Travel Info
- Conditions/Incidents
- Webcams
- Lane Closures
- Traffic Volume Estimates
- Online Transportation Map

Highway Info
- HOV Lanes
- Toll Roads
- Hurricane Evacuation Maps
- Ferry Services

Traveler Services
- Rest Areas & Welcome Centers
- 511 Virginia

Driver Info
- Licenses
- Motorcycle Safety

Maps

**HIGHWAY HELPLINE**
1-800-367-ROAD
(TTY users, call 1-800-432-1843)

# Travel Center

### Northern Virginia
### Smart Travel


Smart Travel VIRGINIA

Home | Smart Traffic Center | Safety | Security | Technology

### Security

A major goal of the national Intelligent Transportation System (ITS) Program is to create "a transportation system that is prepared for and well-protected against attacks; that responds rapidly and effectively to natural and human-caused threats and disasters; that supports appropriate transportation, emergency management and public safety agencies; that ensures the ability to move people and goods even in times of crisis; and that can be quickly and efficiently restored to full capability".

Due to its strategic location near our nation's capital, Northern Virginia's transportation system is critical to regional and national security, and a high profile target for terrorists. Accordingly, Northern Virginia's Smart Travel Program places significant emphasis on transportation security.

Smart Travel systems in place to effectively manage transportation on a day-to-day basis are also the best tools to facilitate transportation management during natural and man-made crises. That is why the VDOT NOVA ITS Architecture deals specifically with establishing information connections between traffic operations and emergency response agencies, and why the Northern Virginia Smart Traffic Center and Smart Traffic Signal System are designed and equipped to serve as centers for emergency response.

**Smart Travel in action**

The Northern Virginia Smart Traffic Center played a key role in both the 9/11 and Capital Beltway-area sniper crises. VDOT was at normal peacetime readiness on September 11, 2001 and rush hour in Northern Virginia was just drawing to a close as the first two airliners crashed into the World Trade Center towers in New York City. VDOT's Statewide Transportation Emergency Operations Center was in the process of implementing a statewide terrorism alert via the Virginia Operational Information System in response to these events when the third aircraft flew directly over the Traffic Center en route to its impact at the Pentagon.

Following this impact, U.S. military authorities and State Police set up a command post at the Smart Traffic Center. The Traffic Center facilitated clearance of traffic in the Washington, D.C. area. Operators immediately

Comr
Travel
Roa
Tra
Hig
Hel
Hig
Veh
Lan
Sma
Dri
Info
Sce
Trip
We

Busin
Rec
Info
Rec
Pro
RFI
Rec
Que
Con
Ma
Con
Bid
Dis
Bus
Ent
Cer
Bus
Dir
Pub
Par

coordinated with other jurisdictions to implement appropriate signal timing plans, suspend construction lane closures and open high-occupancy vehicle lanes.

Personnel at the Smart Traffic Center coordinated with the State Police and other VDOT districts to mitigate traffic effects, respond to incidents, and help monitor essential infrastructure. Similarly, during the Beltway-area sniper crisis in October 2002, law enforcement agencies used the Smart Traffic Center as a command center, using the CCTV for surveillance on area arterials and to coordinate their response in an effort to capture the snipers.

About VDOT | Maps | Road Conditions | Travel Center | Business Center | Planning | Project & Studies | Careers | News | Contact Us

Privacy Statement | Accessibility | FOIA

© 2004 Virginia Department of Transportation

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            1264
CONNECTION TEL               9*500*7725036
CONNECTION ID
ST. TIME            12/16 12:06
USAGE T             06'42
PGS. SENT             15
RESULT              OK
```

JUDICIAL WATCH, INC.
501 School Street, SW, Suite 725
Washington, D.C. 20024
Phone: (202) 646-5172
Fax: (202) 646-5199
http://www.judicialwatch.org



Freedom of Information Ac:
Request

# Fax

**To:** Tony Kendrick
Departmental Disclosure
(DHS)

**From:** Mario Calabrese

**Fax:** 202-772-5036    **Pages:** 15 including Cover

**Phone:**    **Date:** DEC. 1 5 2004

**Re:** Freedom of Information Act
Request

☒ Urgent    ☐ For Review    ☐ Please Comment    ☒ Please Reply    ☐ Confidential

Freedom of Information Act
Request

Another Copy to follow by Certified US Mail

7002 0860 0004 9551 3611

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Tony Kendrick
Director, Departmental Disclosure
DEPARTMENT OF HOMELAND
    SECURITY
Room 3310-15
Washington, DC 20528

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X a. Dunn    ☑ Agent
             ☐ Addressee

B. Received by ( Printed Name )     C. Date of Delivery

A. Turner     12/27/04

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
   (Transfer from service label)     7002 0860 0004 9551 3611

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

WASHINGTON DC 20528

| | | |
|---|---|---|
| Postage | $ | $1.06 ~~$2.30~~ |
| Certified Fee | | $1.75 |
| Return Receipt Fee (Endorsement Required) | | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $5.11 |

Sent To
Tony Kendrick, Dir. Department Dis.
Street, Apt. No.; or PO Box No. DHS, Room 3310-15
City, State, ZIP+4. Washington, DC 20528

PS Form 3800, April 2002          See Reverse for Instructions

```
***********************
***    TX REPORT    ***
***********************

TRANSMISSION OK

TX/RX NO            1266
CONNECTION TEL            9*500*7036937341
CONNECTION ID       DFOI&SR
ST. TIME            12/16 12:18
USAGE T             06'49
PGS. SENT           15
RESULT              OK
```

JUDICIAL WATCH, INC.
501 School Street, SW, Suite 725
Washington, D.C. 20024
Phone: (202) 646-5172
Fax: (202) 646-5199
http://www.judicalwatch.org

# Judicial Watch

# Fax

### Freedom of Information Act
### Request

**To:** James Hogan
Office of FOI & SR (DOD)

**From:** Mario Calabrese

**Fax:** 703-693-7341     **Pages:** 15 including Cover

**Phone:**     **Date:** DEC. 1 5 2004

**Re:** Freedom of Information Act
Request

☒ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☒ **Please Reply**   ☐ **Confidential**

### Freedom of Information Act
### Request

Original to follow by Certified US Mail.

Article Number: 7002 0860 0004 9551 3604



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

WASHINGTON DC 20301

| | | |
|---|---|---|
| Postage | $ | $1.06 |
| Certified Fee | | $2.30 |
| Return Receipt Fee (Endorsement Required) | | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $5.11 |

Postmark Here
DEC 16 2004
12/16/2004

Sent To  James Hogan, FOI&SR, DOD
Street, Apt. No.; or PO Box No.  RM 2C757, 1155 Def Pentagon
City, State, ZIP+4  Washington, DC 20301-1155

PS Form 3800, April 2002          See Reverse for Instructions

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO              1268
CONNECTION TEL               9*500*3243367
CONNECTION ID
ST. TIME              12/16 12:26
USAGE T               06'47
PGS. SENT               15
RESULT                OK
```

JUDICIAL WATCH, INC.
501 School Street, SW, Suite 725
Washington, D.C. 20024
Phone: (202) 646-5172
Fax: (202) 646-5199
http://www.judicialwatch.org



# Fax

Freedom of Information Act
Request

**To:** David M. Hardy
Records/Info Dissemination Sec.
(FBI)

**From:** Mario Calabrese

**Fax:** 202-324-3367

**Pages:** 15 including Cover

**Phone:**

**Date:** DEC. 1 5 2004

**Re:** Freedom of Information Act
Request

☒ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☒ **Please Reply**    ☐ **Confidential**

Freedom of Information Act
Request

Another Copy to follow by Certified US Mail.

Article Number: 7002 0860 0004 9551 3598

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>x ☐ Agent ☐ Addressee<br>B. Received by ( *Printed Name* )    C. Date of Delivery<br>Virginia C. Foster    12/20/04 |
| 1. Article Addressed to:<br><br>David M. Hardy, Chief<br>Records/Information Dissemination Sec<br>Records Management Division<br>FEDERAL BUREAU OF INVESTIGA<br>935 Pennsylvania Ave NW<br>Washington, DC 20535-0001 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>3. Service Type<br>☑ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*) ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*) | 7002 0860 0004 9551 3 |

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(*Domestic Mail Only; No Insurance Coverage Provided*)

7002 0860 0004 9551 3598

| | |
|---|---|
| Postage | $ $1.06 |
| Certified Fee | $2.30 |
| Return Receipt Fee<br>(Endorsement Required) | $1.75 |
| Restricted Delivery Fee<br>(Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.11 |

Postmark Here — WASHINGTON DC 20535
USPS 8240 03 DEC 2004 WASH DC 12/16/2004

Sent To
David M. Hardy, FBI, USDOJ
Street, Apt. No.;
or PO Box No. 953 Penn Ave NW
City, State, ZIP+4
Washington, DC 20535-0001

PS Form 3800, April 2002    See Reverse for Instructions

12/16/2004 12:38 FAX 202 646 5199          JUDICIAL WATCH, INC.          ☒001

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              1270
CONNECTION TEL                9*500*5146117
CONNECTION ID
ST. TIME              12/16 12:34
USAGE T               03'53
PGS. SENT              15
RESULT                OK
```

JUDICIAL WATCH, INC.
501 School Street, SW, Suite 725
Washington, D.C. 20024
Phone: (202) 646-5172
Fax: (202) 646-5199
http://www.judicialwatch.org



Freedom of Information Act
Request

# Fax

**To:** Thomas J. McIntyre     **From:** Mario Calabrese
FOIA/PA Unit, Criminal Division

**Fax:** 202-514-6117     **Pages:** 15 including Cover

**Phone:**     **Date:** DEC. 1 5 2004

**Re:** Freedom of Information Act
Request

☒ **Urgent**     ☐ **For Review**     ☐ **Please Comment**     ☒ **Please Reply**     ☐ **Confidential**

Freedom of Information Act
Request

Another Copy to follow by Certified US Mail.

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )     C. Date of Delivery

DEC 2 0 2004

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Thomas J. McIntyre, Chief
FOIA/PA Unit
Criminal Division
DEPARTMENT OF JUSTICE
Suite 1127, Keeney Building
Washington, DC 20530-0001

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7002 0860 0004 9551 3628

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only: No Insurance Coverage Provided)*

OFFICIAL USE
WASHINGTON DC 20530

| | |
|---|---|
| Postage | $ $1.06 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.11 |

Postmark DEC 16 2004

Sent To
Thomas J. McIntyre, Criminal Division
Street, Apt. No.; or PO Box No.  Suite 1127, Keeney Building
City, State, ZIP+4  Washington, DC 20530-0001

PS Form 3800, April 2002     See Reverse for Instructions

7002 0860 0004 9551 3628